UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRIAN L. ARNOLD,

        Plaintiff,

    v.                                    **DECISION AND ORDER**
                                                            17-CV-987S
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____

        1.     Plaintiff Brian L. Arnold brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security that denied his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act. (Docket No. 1). The Court has jurisdiction over this action under 42 U.S.C. § 405(g).

        2.     Plaintiff protectively filed applications for DIB and SSI with the Social Security Administration ("SSA") on September 12, 2013. (R.[1] at 15, 124-140). Plaintiff alleged disability for the closed period between August 27, 2013 and September 3, 2014 (R. at 31, 206-207) due to cancer to the mouth, lower lip and jaw. (R. at 155). Plaintiff's applications were denied (R. at 72-77), and Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ") (R. at 92-93).

        3.     On April 27, 2016, ALJ Sharon Seeley held a video hearing at which Plaintiff—represented by counsel—appeared and testified. (R. at 28-57). Vocational Expert ("VE") Joey Kilpatrick also testified via telephone. Id. At the time of the hearing,

---

[1] Citations to the underlying administrative record are designated as "R."

Plaintiff was 56 years old, with a 12th grade education and past work experience as a truck driver, auto mechanic helper, and automotive inspector. (R. at 40, 49, 124, 156).

4. The ALJ considered the case *de novo* and, on May 25, 2016, issued a written decision denying Plaintiff's applications for benefits. (R. at 15-24). On July 27, 2017, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (R. at 1-6). Plaintiff filed the current action, challenging the Commissioner's final decision,[2] on October 2, 2017. (Docket No. 1). Both parties moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. (Docket Nos. 10, 13). Plaintiff filed a response on October 15, 2018 (Docket No. 14), at which time this Court took the matter under advisement without oral argument. For the reasons that follow, Plaintiff's motion is granted, and Defendant's motion is denied.

5. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). Substantial evidence is that which amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the

---

[2] The ALJ's May 25, 2016 decision became the final decision of the Commissioner of Social Security on this matter when the Appeals Council denied Plaintiff's request for review.

2

Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

6. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference and will not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

7. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled under the Act.  See 20 C.F.R. §§ 404.1520, 416.920.  The Supreme Court of the United States recognized the validity of this analysis in Bowen v. Yuckert, and it remains the proper approach for analyzing whether a claimant is disabled.  482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987).

8. The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or

3

> mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (quotations in original); see also 20 C.F.R. § 404.1520; Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

9. Although the claimant has the burden of proof on the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). The final step is divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

10. The ALJ analyzed Plaintiff's claim for benefits under the process set forth above. At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 27, 2013. (R. at 17). At step two, the ALJ found that Plaintiff has the severe impairment of reconstruction of the lower lip post squamous cell carcinoma.

Id. At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any impairment(s) listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18).

11. Next, the ALJ found that between August 27, 2013 and September 3, 2014, Plaintiff had the residual functional capacity ("RFC") to perform a less than full range of light work with certain exceptions:

> Specifically, [Plaintiff] could lift and carry ten pounds occasionally and light items such as folders or small tools frequently; stand and/or walk six hours in an eight-hour workday, alternating after thirty minutes of walking to sitting ten minutes; sit six hours in an eight-hour workday, alternating after three hours to standing ten minutes; occasionally stoop and climb stairs, but never kneel, crouch, crawl or climb ladders, ropes or scaffolds; and work in an environment with no exposure to hazards such as unprotected heights or moving machinery.

(R. at 19).

12. At step four, the ALJ found that between August 27, 2013 and September 3, 2014, Plaintiff was not capable of performing any past relevant work. (R. at 22). At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could have performed during the relevant period. Id. Finally, the ALJ determined that Plaintiff was not disabled "from June 3, 2012, through the date of [the ALJ's] decision." (R. at 23).

13. Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ (1) failed to properly consider Listing 1.08; (2) failed to consider excessive absenteeism caused by Plaintiff's multiple surgeries; and (3) improperly substituted her own judgment for medical opinion. (Docket No. 10 at 8-19). For the reasons that follow, remand is warranted.

14. Plaintiff contends that the ALJ's RFC determination is based on legal error because the ALJ "fail[ed] to properly consider Medical Listing 1.08" and "failed to set forth her rationale at step three." Id. at 14, 17-18. Instead, Plaintiff asserts, the ALJ merely listed the requirements of Listing 1.08 and concluded Plaintiff's condition did not meet the criteria but "never provided an analysis" of the evidence that supports the adverse finding.

15. In determining whether a claimant's impairment or combination of impairments meets or medically equals one of the Listings, an ALJ must provide a "specific rationale" to support her conclusions. McHugh v. Astrue, No. 11-CV-00578 MAT, 2013 U.S. Dist. LEXIS 110412, at *17, 2013 WL 4015093 (W.D.N.Y. Aug. 6, 2013) (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir.1982)).

16. The absence of a clearly articulated rationale for an ALJ's conclusions may not warrant remand, provided the reviewing court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [her] determination was supported by substantial evidence." Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (summary order) (quoting Berry v. Schweiker at 469).

17. However, the ALJ must justify an adverse determination that the claimant's impairments do not meet or medically equal one of the Listings with "more than a brief, conclusory statement." McHugh at *17 (finding substantial evidence did not support the Commissioner's denial of benefits where "the ALJ found without analysis or explanation" that a claimant's impairment(s) did not meet or medically equal a considered Listing).

18. Listing 1.08 is met when a claimant has a:

> Soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00(M), directed toward the salvage or restoration of major function, and such major

6

> function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.08

19. "[C]ontinuing surgical management" means "surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part." Id. at §1.00(M). It also "may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy." Id.

20. This Court notes that, although not explicitly addressed, the requirement of "continuing surgical management" is apparently satisfied. Defendant acknowledges that Plaintiff underwent five surgeries to excise his tumor and complete reconstruction of his lower lip between August 2013 and August 2014. (Docket No. 13 at 8).

21. The crucial issue upon appeal is whether the ALJ properly considered restoration of major function of Plaintiff's lip and mouth during the relevant period. When determining whether Listing 1.08 is met, "[m]ajor function of the face and head […] relates to impact on any or all of the activities involving vision, hearing, speech, mastication, and the initiation of the digestive process." Id. at §1.00(O).

22. A review of the ALJ's decision reveals a questionable reliance on evidence that postdates the end of the alleged disability period. At step two, the ALJ determined that Plaintiff's dysphagia (difficulty swallowing) is not a medically determinable impairment ("MDI"). In support of this determination, the ALJ cited Plaintiff's December 31, 2014 esophagram, which was "essentially normal" and referenced Plaintiff's testimony that, provided he has something to drink with his food, he is able to eat steak. (R. at 18).

7

23. At step three, the ALJ gave "[s]pecific consideration […] to [L]isting 1.08," but found that "the record fails to show that major function of the claimant's lip and mouth were not restored within twelve months after onset." (R. at 18).

24. The ALJ's conclusory statement that "the record fails to show" that Plaintiff met the criteria of Listing 1.08 (R. at 18) requires this Court to "look to other portions of the ALJ's decision and to clearly credible evidence" to determine whether the ALJ's determination is supported by substantial evidence. <u>Salmini</u> (2d Cir. 2010).

25. Regarding Plaintiff's ability to eat, the ALJ noted that after his first reconstruction surgery, Plaintiff reported feeling well and had improved oral continence. (R. at 20). The ALJ also noted that Plaintiff "reported some difficulty eating certain types of foods" on March 23, 2015. (R. at 20). The ALJ does not articulate how these facts support a finding that major function of Plaintiff's lip and mouth were restored within 12 months of onset. Without such explanation, this Court is unable to assess the logic behind this determination, especially after reviewing the evidence discussed.

26. Following the first reconstructive surgery, Plaintiff's surgeon, Dr. Lohman, did find that oral continence had improved, but the note from this January 22, 2014 postoperative physical examination states in full: "He is still having some difficulty with oral continence but this is improved since his last operation." (R. at 363). The surgeon noted Plaintiff was "[d]oing reasonably well following near-total lower lip reconstruction," but would "need to return in about a week" to prepare for another surgery. (R. at 363).

27. The ALJ's only other mention of Plaintiff's ability to eat references a clinic note, dated more than six months after the end of the alleged disability period, which indicates Plaintiff reported "difficulty eating certain types of food" and complained of

8

"persistent incompetence of the lip." (R. at 407). That record also notes "[Plaintiff's] dysphagia to certain foods persists." Id.

28. Defendant argues there is no need for a more detailed discussion of Listing 1.08 because "the evidence shows Plaintiff's major function (mastication and the initiation of the digestive process) was restored within 12 months of onset." (Docket No. 13 at 8). As evidence of this timely restoration of major function, Defendant points out that "Plaintiff was managing to eat soft foods without any problems" by September 11, 2013, more than two weeks after his first surgery. Id. However, Defendant also notes that Plaintiff underwent another surgery more than three months later because it was "difficult for [Plaintiff] to retain oral contents and eat normally." Id.

29. Like the ALJ, Defendant highlights Plaintiff's improved oral continence following the first reconstructive surgery and cites Plaintiff's 2016 testimony that he is able to eat steak. Id. Unlike the ALJ, Defendant attempts to explain why this evidence—that Plaintiff could eat soft foods (R. at 313), but had difficulty eating normally months after surgery (R. at 358), had improved oral continence after his first reconstructive surgery (R. at 363), but still required three further surgeries (R. at 367, 376, 387), and was able to eat steak in 2016 (R. at 46)—constitutes substantial evidence that major functioning was restored within 12 months of the alleged onset date.

30. According to Defendant, Plaintiff's post-surgical weight gain demonstrates that "major functioning in mastication and the initiation of the digestive process was restored." (Docket No. 13 at 8-9). The record indicates that Plaintiff gained more than 14 pounds (6.5kg) between August 19, 2013 (R. at 233) and August 28, 2014 (R. at 390), and Plaintiff testified that he had "gained like 40 pounds" after his surgeries (R. at 33).

31. Even if this Court were inclined to accept a post hoc explanation for agency action here, no medical opinion or other evidence in the record supports Defendant's unfounded claim that weight gain is evidence of lip or mouth functionality. In fact, such weight gain may support a contrary conclusion. After all, an individual who has difficulty eating certain foods might make unhealthy dietary substitutions that result in weight gain.

32. The ALJ's failure to articulate a specific rationale for finding Listing 1.08 was not met, together with a seeming reliance on evidence that postdates the alleged disability period constitutes legal error that warrants remand.

33. Plaintiff also contends that the ALJ erred in failing to consider surgery-related absenteeism in the context of his disability claim. (Docket No. 10 at 9). Citing Mendoza v. Berryhill, 16-CV-7730-GWG, 287 F. Supp. 3d 387, 391 (S.D.N.Y. Dec. 7, 2017), Plaintiff argues, "[i]t is a general rule that vocational experts testify that if an individual needed to miss more than one day a month due to her or her [sic] impairments, that individual would not be able to work at all." (Docket No. 10 at 8).

34. This is an overbroad generalization of the testimony in Mendoza, in which the VE was asked about "a hypothetical individual of Mendoza's age, education and work experience" who was "limited to simple, unskilled work," "would need a low stress position" with "only occasional [social] interaction" and "no fast-paced work environment." Id. The VE testified that if the described individual "missed more than one day of work per month, this person would not be able to work at all." Id. Here, Plaintiff does not claim to have functional limitations identical to those of the hypothetical individual described in Mendoza, so that holding is not controlling.

35.     Nevertheless, Mendoza does provide some support for the proposition that excessive impairment-related absenteeism may render an unskilled worker unemployable, as does a survey of recent caselaw.  See Hayden v. Comm'r of Soc. Sec., 338 F. Supp. 3d 129*, 2018 U.S. Dist. LEXIS 176076, 2018 WL 4941783 (W.D.N.Y. Oct. 10, 2018) (VE testimony that employers of unskilled workers "allow an unscheduled absence about one time a month, 12 times over the course of the year."); Clark v. Colvin, 2015 U.S. Dist. LEXIS 40617 *, 2015 WL 1458628 (W.D.N.Y. Mar. 30, 2015) (VE testified that for unskilled employment, "more than one absence a month likely would be impermissible"); Raymer v. Colvin, 2015 U.S. Dist. LEXIS 112218, *18, 2015 WL 5032669 (W.D.N.Y. Aug. 25, 2015) ("vocational expert testified that absences in excess of one day per month would preclude competitive employment for unskilled, entry level work"); Gross v. Astrue, 2014 U.S. Dist. LEXIS 63251, *38, 2014 WL 1806779 .") (W.D.N.Y. May 7, 2014) (VE "testified that for unskilled, entry level positions, employees are typically limited to absences of one-half day per month" and "an employee who required more breaks or absences […] would not be able to maintain competitive employment.").

36.     Here, the VE testified that Plaintiff has no transferrable skills and his prior relevant work experience was limited to semi-skilled (SVP 3) work.  (R. at 49).  The VE then testified that a hypothetical individual of Plaintiff's age, education, work experience, and physical limitations, and who could not be exposed to hazards such as unprotected heights or moving machinery, would be able to perform unskilled work such as that required of an information clerk, ticket seller, or potato chip sorter.  (R. at 23, 49-51).

37.     However, we have no VE testimony about how Plaintiff's surgery-related absences would have impacted his employment prospects, because neither the ALJ nor

Plaintiff's attorney asked the VE about absenteeism. (R. at 48-57). This is problematic because the record is clear that Plaintiff's treatments would have resulted in multiple absences if he had been working during the relevant period.

38. Plaintiff's first surgery, on August 27, 2013, required an eight-day hospitalization. (R. at 306). Plaintiff was "doing well" at a follow-up appointment on September 11, and again on September 18, 2013. (R. at 313, 316). On September 25, 2013, more than four weeks after surgery, Robert Lohman, M.D. opined, "[Plaintiff] is free to begin transitioning back to his regular activities." (R. at 319). The ALJ did not evaluate this opinion or consider how these absences would impact Plaintiff's employability.

39. The record also indicates that Plaintiff would have been absent from work in connection with each of his four subsequent surgeries. On February 5, 2014, following surgery on January 30th, Dr. Lohman opined, "[Plaintiff] is free to transition back to his usual activities." (R. at 369). After surgery on April 25, 2014, Dr. Lohman once again deemed Plaintiff cleared "to return to all of his activities without restrictions" on May 8, 2014, nearly two weeks later. (R. at 380).

40. The ALJ acknowledged that Plaintiff would have needed some time to recover after each of these procedures, noting that Plaintiff "may have missed a day if one of the operations actually conflicted with his work – for example, if [Plaintiff] had the surgery on Friday, he may not have worked that Saturday." (R. at 21). However, the ALJ seems to have considered such absenteeism insignificant, emphasizing, "[Plaintiff] testified that he returned to his part time work as a security guard within the week after each of his revision surgeries." Id.

41. Because the ALJ had already determined that such work—providing security for a church bingo hall two nights per week, for three hours each night—did not rise to the level of substantial gainful activity ("SGA") (R. at 17), it is difficult to fathom how a return to such activity constitutes substantial evidence that Plaintiff could likewise have performed full-time work on a sustained basis at that time. Moreover, the ALJ's emphasis on the speed with which Plaintiff was able to return to his part-time work duties—"within the week" (R. at 21)—implies the ALJ believed Plaintiff would have been absent from any work for several days after each of his four reconstruction surgeries.

42. If this is true, as the ALJ seems to grant, Plaintiff's lip reconstructions alone could reasonably be expected to have caused him to miss more than 12 days of work. We also know that Plaintiff was hospitalized for eight days for removal of his tumor on August 27, 2013, and that Plaintiff's doctor did not clear him to return to regular activities until September 25, 2013. Such absenteeism, even without any other limitations, could reasonably foreclose all employment possibilities.

43. Despite this, the ALJ did not include any limitations on work attendance in either the RFC determination or hypotheticals posed to the VE. Instead, the ALJ focused primarily on how much weight Plaintiff would have been able to lift and how much energy he had between surgeries. The ALJ points out that "only two months after […] the date of [Plaintiff's] original extensive surgery, […] [Plaintiff] reported that he swept, mopped floor, vacuumed rugs, made beds drove, shopped once a week for about an hour, and could walk a mile without stopping." (R. at 21). This evidence does suggest that Plaintiff was able to perform more than sedentary work after recovering from surgery. However,

13

this also suggests periods of recovery time and consequent work absences in excess of what employers would tolerate.

44.     Defendant largely ignores this argument, responding only that "the recovery time after each of [Plaintiff's] surgeries did not exceed twelve consecutive months, and therefore did not satisfy the one-year durational requirement for establishing disability under the Act." (Docket No. 13 at 13). While recovery time that required a claimant to miss work for twelve consecutive months would certainly mandate a finding of disability, there is no logical corollary that implies that a full, uninterrupted year of work absence is necessary to establish a claimant's disability, as Defendant seems to suggest.

45.     Based on the record (and the ALJ's implicit acknowledgment) that Plaintiff would have missed as many as six weeks of work that year, the ALJ's failure to address the issue of absenteeism was legal error.

46.     Plaintiff also contends that the ALJ impermissibly "substitute[ed] her own 'medical' judgment for that of any physician." (Docket No. 10 at 10). "It is well-settled that an ALJ cannot substitute her own judgment for that of a medical professional." Gunter v. Comm'r of Soc. Sec., 361 Fed. Appx. 197, (2d Cir. 2010).

47.     Defendant acknowledges that "the only opinions about Plaintiff's functioning were discharge instructions after his surgeries temporarily restricting him from strenuous activity or lifting more than 10 pounds." (Docket No. 13 at 11). These discharge instructions—labeled with Plaintiff's name, address, date of birth, and medical record number—restrict Plaintiff from lifting objects heavier than ten pounds and performing strenuous activity for one week after his January 30, 2014 surgery, and again for one

week following surgery on April 25, 2014. (R. at 403-05). Similar instructions, dated August 20, 2014, restrict such activities for two weeks. Id.

48. Nothing in the record contradicts these instructions, which even Defendant finds credible, "[t]o be sure, during the short recuperative periods following Plaintiff's procedures, he could be expected to have temporary restrictions." Id.

49. However, unlike Defendant, the ALJ dismissed this evidence outright, stating "these form instructions appear to be prophylactic and not a statement of the claimant's functional capacity." (R. at 21). Continuing to draw unsubstantiated conclusions, the ALJ wrote, "[i]n addition, [the discharge instructions] apparently are not treated as medical records by [the hospital], as the claimant's representative testified that he had inquired and the medical facility does not have a copy." Id.

50. "Where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). To do this, an ALJ is authorized to recontact a treating physician or hospital, or to order a consultative examination from an SSA examiner or a medical expert. See Covey v. Colvin, 204 F. Supp. 3d 497, 507 (W.D.N.Y. 2016) (To fill a gap in the record, the ALJ "could have requested addition information from the treating physician […]; he could have obtained an SSA consultative examination; and/or he could have requested an opinion from a medical expert.")

51. Nowhere in the regulations is an ALJ authorized to resolve an evidentiary gap based on unfounded assumptions about the intent of medical restrictions ("these form instructions appear to be prophylactic"), or on a third-party's representation of what is or

is not included in a claimant's hospital records.  Because the ALJ rejected what Defendant admits are "the only opinions about Plaintiff's functioning" without providing good reasons and without attempting to develop the record, remand is warranted.

52.    Upon remand, the ALJ is directed to further analyze whether Listing 1.08 was met during the relevant period, particularly considering when major function was restored; to consider absenteeism in the context of employability during the closed period; and to further develop the record as needed to address any evidentiary gaps.


IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 10) is GRANTED.

FURTHER, that Defendant's Motion for Judgment on the Pleadings (Docket No. 13) is DENIED.

FURTHER, that this case is REMANDED to the Commissioner of Social Security for further proceedings consistent with this decision.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.


Dated:     June 12, 2019
           Buffalo, New York


                                             /s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                          United States District Judge